### SMITH ET AL. v. THE C. R. & M. R. R. Co.

1. **Contract**: CONSTRUCTION: LAND GRANT. By the terms of a contract between S. and the defendant, they were together to endeavor to obtain a certain grant of land for the construction of a railway from A. to the Missouri river; the defendant constructed from C. to the last named terminus, and S. became subrogated to the rights of those who had constructed from A. to C.; a certain grant was obtained by the defendant, although it did not appear that any part of it was for constructing from A. to C.: *Held*, that S. was entitled, under the contract, to no part of the grant obtained by defendant.

2. ———: ———: ———. The fact that the legislature, in conferring the grant to defendant, provided that the lands should only be given if the road should be commenced at M. (between A. and C.) and that defendant actually commenced at C., while S.'s grantors built from M. to C., would not operate to give to S. that portion of the lands which defendant would have earned by constructing the part designated.

3. ———: FAILURE TO PERFORM: LACHES. One of the parties to a contract cannot complain of a failure to perform by the other, if his own laches has contributed to defeat the purpose of the contract.

*Appeal from Linn District Court.*

TUESDAY, JUNE 6.

ACTION for specific performance. In May, 1856, Congress granted certain lands to the State of Iowa for the purpose of

building a railroad from Lyons City, northwesterly, to a point of intersection with the main line of the Iowa Central Railroad near Maquoketa, thence on said line, and as near as practicable to the 42nd parallel, to the Missouri river. This grant included the odd-numbered sections lying within a certain number of miles of the projected railroad. In July, 1856, the State granted said lands on certain named conditions to the Iowa Central Air Line Railroad Company, which grant was accepted by the company. In March, 1858, said company issued certain bonds, and executed a mortgage on the lands, to secure the payment of the same. In said last named year, or previous thereto, said company caused a survey of the road to be made, and did a large amount of grading thereon. In November, 1859, said company conveyed all its interest in and to said lands, to the Dubuque, Marion and Western Railroad Company. In March, 1860, the State resumed said grant on the alleged ground that the Iowa Central Air Line Railroad Company had forfeited the same by failing to complete its road as required by the terms of the grant. Afterward, but in the same month and year, the State granted said lands to the Cedar Rapids and Missouri River Railroad Company, and which company subsequently conveyed the same to the Iowa Railroad Land Company. In 1861 certain holders of the bonds of the Iowa Central Air Line Railroad Company, secured by the aforesaid mortgage, foreclosed the same, and a decree was entered in the District Court of the United States, directing a sale of the said lands, or a sufficient portion thereof, to satisfy such decree. The Cedar Rapids company was made a party to this proceeding, but as to it the action was dismissed. In June, 1864, Congress granted to the Cedar Rapids company the even numbered sections of land on each side of its projected railroad, with power to change the route so as to reach the Missouri River at or near Council Bluffs. The original petition seeks to compel the defendants to specifically perform a certain contract made in relation to these lands, by compelling the defendants to convey forty-six thousand acres of said lands to the plaintiff, Platt Smith, who, it is claimed, has acquired all the rights thereto that were ever owned or

possessed by said Air Line Company, the Dubuque, Marion and Western Company, or which were obtained under the decree aforesaid, which decree he offered to transfer and assign to defendants. In an amendment to the petition, the plaintiff claims to be entitled to said lands under and by virtue of the two Acts of Congress aforesaid. The answer denies certain allegations in the petition, and admits others, and on the pleadings and proofs the District Court dismissed the petition, and plaintiffs appeal.

*Geo. Crane* and *Platt Smith*, for appellant.

The phrase "it being understood," when used in written instruments, imports an agreement. (*Higginson v. Wilde,* 14 Gray, 170.) The contract not having been set aside or rescinded, plaintiff has the right to compel a specific execution, relying upon the fact that the conduct of defendant has dispensed with an offer of performance from plaintiff by rendering it useless. (*Armstrong v. Pierson,* 5 Iowa, 325; *Collins v. Vandever,* 1 Id., 578.) Defendant's inability to hold the lands acquired for the construction of the line it did not build, will not release it from the obligation to convey to plaintiff, just as if they had been obtained according to the terms of the agreement. (*Jenkins v. Frink,* 30 Cal., 586; *Armour v. Alexander,* 10 Paige, 572; *Swinburne v. Swinburne,* 28 N. Y., 568; *Bryant v. Hendricks,* 5 Iowa, 258.) Defendant having obtained title to the lands by an act of bad faith, and in clear violation of its covenant with plaintiff, it must be held to have received them in trust for the use and benefit of plaintiff. (*Snow v. Flannery,* 10 Iowa, 318; *Dikeman v. Norrie,* 36 Cal., 94.) Defendant will not be allowed to set up illegality in the acquisition of its title, but is bound to convey to plaintiff the same as if title had been obtained strictly in accordance with the terms of the contract. (*Farrow v. Bragg,* 30 Ala., 261; Bigelow on Estoppel, 585.) The vendor, from the time the contract for the sale of real estate is consummated, is the trustee, with respect to the land, for the vendee, and the vendee as to the purchase money the trustee for the vendor, and the latter has a lien on the land for the same.

(*Champion v. Brown*, 6 Johns., Ch. 40; *Swartland v. Burr*, 1 Barb., 499; 2 Story's Eq., § 789.) As to the parties or the subject matter of a contract, extrinsic evidence may be received to make certain, if necessary for that purpose. (2 Pars. on Con., 5 ed. 549.)

*N. M. Hubbard* and *E. S. Bailey*, for appellees.

The certificates of the Governor and Department of the Interior did not alter, or affect in any way, defendant's right to the land, but merely perfected the evidence of a title and interest already acquired. (*Iowa Homestead Co. v. Webster Co.*, 21 Iowa, 221.)

SEEVERS, CH. J.—I. It is objected there was no consideration for the contract. It is evident from the testimony that the plaintiffs, for some years prior thereto, and subsequent to the resumption of the grant by the State, made claim to a portion of these lands; there had been considerable correspondence and negotiations between the parties, and we think it is pretty clear the proviso in the Act of Congress, passed in 1864, was inserted therein at their solicitation and for their benefit. The effect of this proviso will be hereafter considered.

The claim made to these lands by the plaintiffs may have been doubtful, and, looking at it in the light of to-day, it is not entirely clear but that it was groundless. But that it may not have so appeared to the defendants at the time the contract was made is evident, for the reason that it was made as a compromise and settlement; therefore we incline to believe there was a sufficient consideration to support it. The objection is not, therefore, well taken.

II. The main and important question, however, is as to
1. CONTRACT: the proper construction of the contract. It is as
construction:
land grant.     follows:

"*Resolved*, That the contract (so called) contained in letters and papers between the president of this company and Hon. Platt Smith, attorney for certain owners of a judgment against the late Iowa Central Company, and as claimed by

said Smith, concerning the lands granted to the company, is a fair and just basis of compromise of said claim and judgment, and the president is authorized to settle the same in conformity with the spirit of the contract referred to, with the right also to adjust, in his discretion, any difference of opinion that may be between the parties relating to the right of way or franchise between Anamosa and Lyons, it being understood that both parties shall unite in an earnest effort to draw the lands on the Anamosa line by which this contract can be satisfied. This matter is to be settled as follows: The forty-six thousand acres of land shall be taken from the land grant remaining undisposed of, and to which the title is undisputed, beginning at the township line north of Mapleton in Monona county, on the northerly side of the surveyed line of the Iowa Central Railroad, taking odd and even numbers to which either of the Acts of Congress has given title, running thence east only on the northerly side of said line, for quantity taking all lands of the grant to which the title is undisputed. The decree to be assigned to John I. Blair. The question of old grade to be left for future consideration. The parties agree to join in doing all acts which may be necessary to complete the title, which shall be transferred to Platt Smith as attorney, or to such other parties as may be mutually satisfactory. It being understood that the intent is to draw lands for the road from Anamosa to the Missouri river. This shall be a full and final settlement of all claims and demands between the parties.

*Provided*, This settlement is on this condition, that the parties shall be able to hold for, and on account of, the construction of the road from Anamosa to Cedar Rapids, at least as much land as forty-six thousand acres.

The Cedar Rapids and Missouri River Railroad Company,

By JOHN I. BLAIR.

PLATT SMITH,

Attorney."

Cedar Rapids, June 28th, 1867.

The power and authority of the persons signing the con-

tract to bind 'the respective parties does not seem to be questioned.

The letters and papers referred to consist, *first*, of a proposition for a contract made by L. B. Crocker, president of the Cedar Rapids company, on the 27th day of June, 1864, the concluding portion of which is as follows: "It is not intended in this agreement that any more or other lands are embraced in this agreement than one-half of the land which the Cedar Rapids and Missouri River Railroad Company shall be able to draw from the State or United States, under the laws of Congress and the State of Iowa, for the construction of the road from Anamosa to Cedar Rapids. It is understood that these parties will unite to perfect this agreement by the proper legal papers, within a reasonable time." *Second.* Mr. Smith's reply thereto, that the proposition is satisfactory, provided he or those for whom he is acting can have the old Central Air Line grade. *Third.* A reply from Crocker, showing that he was unwilling to yield the question as to the old grade, and suggests that the matter stand until there is a meeting of the board; and *fourth*, the reply of Crocker, dated Dec. 5th, 1864, to a letter from Smith, not in the abstract, in which Crocker says, "I can see no special objections to the bill you propose, to enable us to divide the lands, but I do not believe Judge Hubbard will let the bill pass without explanation. I am not yet satisfied that I cannot, with your co-operation, draw the lands on the certificate of the governor that we have constructed the road from Anamosa to Cedar Rapids."

This is all the documentary evidence, except the Acts of Congress and the State, that has any bearing on the question of the proper construction of the contract.

One of the considerations upon which the State made the grant to the Cedar Rapids company was as follows: "Said company shall not commence to build or construct said road at a point further west from the Mississippi river than the town of Marion, in Linn county, Iowa, and the governor of the State shall not certify any of the lands herein transferred to said company, until that portion of the road between said

town of Marion and the city of Cedar Rapids is completed."

Under these several Acts of Congress and the State, the Cedar Rapids company obtained more than a million acres of land, to a portion of which, however, it is claimed there are adverse claims, other than the one set up by the plaintiffs under the contract. The Cedar Rapids company never built the road between Anamosa and Cedar Rapids, or between the latter and the town of Marion, but the same was built by the Dubuque Southwestern company; and whatever right said company or the Air Line company had in or to these lands, either under the acts of Congress or the State, or that may have inured to the Dubuque Southwestern company by reason of building said road, it will be assumed has vested in the plaintiff, Smith.

No lands were drawn or obtained for building the road from Anamosa to Cedar Rapids, or from the town of Marion to Cedar Rapids, unless they were embraced in those drawn or obtained for building the road from Cedar Rapids west. Under the evidence there can be neither doubt nor cavil as to this proposition. Smith, or those under whom he claims, built a road from Anamosa by way of the town of Marion to Cedar Rapids; but neither he nor they had a land grant, while the defendant built no road between such points, but had such grant; and it is evident they both believed it to be possible, by uniting their forces, that lands might be drawn for that part of the road, and if accomplished, they agreed to divide. This, we think, is clear and evident from both the contract and correspondence between Crocker and Smith; the latter, at least, believed that, for the purpose of aiding in the accomplishment of this purpose, a bill should be presented to and passed by the General Assembly or Congress, or both. It is true the defendant, by the terms of the contract, agreed to convey certain designated lands, but only on the "condition that the parties shall be able to hold, for and on account of the construction of the road from Anamosa to Cedar Rapids, at least forty-six thousand acres;" and they "agreed to unite in an earnest effort to draw the lands on the Anamosa line by which the contract can be satisfied." The condition

was that the parties—not one, but both—shall be able to hold, that is, draw and obtain lands for the Anamosa line before the contract could be satisfied. The lands thus obtained were to belong to the defendant, and those designated in the contract conveyed in lieu thereof. It is urged that the controlling provision in the contract is, that the "intent is to draw lands from Anamosa to the Missouri river." Is this true when the contract is considered as a whole, in the light of the surrounding circumstances? It is not pretended that the plaintiffs ever built any portion of the road from Cedar Rapids to the Missouri river, or that they were entitled to any lands because the defendant had done so. Then why should the plaintiffs unite in drawing such lands? The disputed matter was, whether either or both were entitled to any lands for building the road from Anamosa to Cedar Rapids. As has been said, one party built such road, and the other had the grant; neither separately was entitled to the lands, for the simple reason that neither had complied with the conditions of the grant; hence they agreed to unite, and if any lands were obtained for that portion of the road, there was to be a division, and the contract obligatory. We, therefore, think the controlling provision in the contract is, that the parties should be able to draw lands for the road between Anamosa and Cedar Rapids. Under the Acts of Congress the lands were to be drawn according to the miles of road built, and it is clear and undisputed that the defendant only drew or obtained lands it was entitled to for building the road from Cedar Rapids to the Missouri river. No lands were drawn for building the road from Anamosa to the Missouri river, unless "from Cedar Rapids" to said river means "from Anamosa" to such river.

III.  In making the grant to the defendant, the State provided that it should receive no title to the lands, unless it commenced building its road at Marion. With this condition of the grant the defendant has failed to comply, and it is urged that inasmuch as the plaintiffs have built that portion of the road, the defendant should convey to the plaintiffs at least as much land as would have been

obtained if the road had been built by the defendant.   In this view we do not concur.   As we have seen, no lands have been obtained for building that piece of road, nor had plaintiffs any grant of land for that purpose.   By no act of the defendant have they been deprived of any lands to which they were legally entitled.   The fact that defendant had such grant, and plaintiffs built the road, would not alone entitle the latter to the lands either from the defendant or the State.   If it be admitted defendant has drawn or obtained lands without complying with the conditions of the grant, such fact will not aid the plaintiffs.   If the State is satisfied, they have no reason to complain.

IV.   Three days after the contract was signed, a large amount of lands were certified to defendant; the affidavit necessary to obtain such certificate was sworn to, two days previous to the contract being executed. These were the last lands drawn or obtained by the defendant. It is urged that, in so doing, the defendant violated the contract and committed a fraud on plaintiffs.   It will be readily seen, however, that neither of these positions is well taken, if the construction given to the contract is correct.

*3. ——: failure to perform: laches.*

It is also urged that defendant has not united with plaintiffs in an earnest effort to draw or obtain lands for building the Anamosa line.   To this, several answers may be well given. No such request was ever made.   Nor do the plaintiffs seem to have made any effort in this direction.   It is true the efforts were to be united or joint, and it is equally true that none such were made by the parties, jointly or separately.

It may be said, then, that both were in fault, but certainly the plaintiffs can claim nothing by reason of their own laches.

Nor is it by any means clear that the united efforts of both parties would have accomplished anything, unless such efforts culminated in obtaining the passage of an Act of Congress or the General Assembly, recognizing the validity of the claim made by the plaintiffs.

V.   The proviso to the Act of Congress passed in June, A. D. 1864, gave the plaintiffs no title or right to any lands or anything else.   The most that can be said is, that it recog-

nized and preserved whatever legal or equitable rights they may at that time have had. It neither adds to nor strengthens the contract, nor does it aid in the construction thereof.

The judgment of the District Court is, therefore,

AFFIRMED.